UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION



*****************************************************************

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | CR. 12-30088(01)-RAL |
| Plaintiff, | * | |
| -vs- | * | REPORT AND RECOMMENDATION FOR PARTIAL DISPOSITION OF MOTION TO SUPPRESS EVIDENCE |
| ALEXIS SALGADO, | * | |
| Defendant. | * | |

*****************************************************************

## SUMMARY

In this possession with intent to distribute methamphetamine case, Alexis Salgado seeks to suppress evidence seized from his car after a drug dog indication. He maintains that the dog was not reliable – and thus her indication was not credible enough – to provide probable cause to search the car. Because the search was lawful and conducted with the requisite probable cause, the Court recommends that Salgado's motion be denied on this ground.

## BACKGROUND

On May 20, 2012, at around 1:30 a.m., Justin Schmiedt, a trooper with the South Dakota Highway Patrol, stopped on South Dakota Highway 44, near Winner, South Dakota, to provide assistance to two men – later identified as Salgado and James Menard – who were tending to an overheated Ford Taurus with its hazard lights on parked along

the side of the roadway. When the men said that they did not need any help and one of them, Salgado – the driver, related that he never had a driver's license and provided a name and date of birth that were not on file, Schmiedt became suspicious. Schmiedt's suspicions were further aroused when he observed a hoodie sweatshirt with a large marijuana leaf on it draped over what appeared to be electronic equipment in the backseat, and when Salgado was unable to identify his two passengers (one of whom he said he had known for a month or two) and insisted there were no drugs in the car, but would not give consent to search it.

Believing that criminal activity was afoot, Schmiedt called Brian Biehl, another trooper and a drug dog handler, and requested assistance. While waiting for Biehl, Schmiedt learned that Salgado had been arrested the month before for burglary and for a controlled substance offense (after Salgado had earlier denied having any prior arrests), that he had been ordered deported from the United States but the country he came from – Cuba – would not take him back, that the name Menard gave – Jameson Blue Bird – was likewise not on file and that the third man in the car, David Andrews, did not have a driver's license either. About 55 minutes after the call from Schmiedt, Biehl arrived at the scene and deployed Zara, a 19-month-old Belgian Malinois, around the car. Zara initially alerted to the front hood, on the driver's side, of the car and then indicated to the rear passenger side door.

Schmiedt, Biehl and Shaun Petit, a Tripp County Deputy Sheriff, then searched the Taurus. In the front engine compartment, by the battery, Biehl found an empty pack of

Newport cigarettes lined with a plastic bag containing methamphetamine. Marijuana and a glass pipe were also discovered in the rear passenger sector of the car, along with a vehicle diagnostic machine, a laptop computer, a baseball cap (with marijuana residue in the headband) and speakers. All of these items were seized and removed from the car.

Salgado was arrested that night and eventually charged by federal indictment with possession with intent to distribute a controlled substance (methamphetamine) or in the alternative, aiding and abetting in the commission of the same. Following his not guilty plea, he moved to suppress the search of his car based on Zara's indication. Upon receipt of the Government's opposition to the motion, the Court held a hearing at which it heard testimony and received documentary evidence (drug dog certificates and records).

## DISCUSSION

**Probable Cause and Drug Dog Indications**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and affects, against unreasonable searches and seizures,"[1] a protection that ordinarily requires that a warrant be obtained "upon probable cause"[2] unless an exception applies.[3] Due to the "ready mobility" and diminished expectation of privacy resulting from the "pervasive regulation" of motor vehicles on the public

---

[1] U.S. Const. amend. IV.

[2] *Id.*

[3] *See Katz v. United States*, 389 U.S. 347, 357 (1967); *accord Arizona v. Gant*, 556 U.S. 332, 338 (2009).

highways,[4] the search of a vehicle for contraband is justified if there is probable cause to believe that contraband is present.[5] And a trained and certified drug-detection dog's indication, upon the exterior of a vehicle, provides the requisite "probable cause to believe that the vehicle contains contraband."[6]

**Training and Certification**

The Supreme Court has held that "the use of a well-trained narcotics-detection dog – one that 'does not expose non-contraband items that otherwise would remain hidden from public view' – during a lawful traffic stop, generally does not implicate legitimate privacy interests," and is not a search for purposes of the Fourth Amendment.[7] A dog sniff has been recognized as a "sui generis" tool for contraband investigation,[8] because it "is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure."[9] The Court has also held that "a positive result" of such a sniff "would have resulted in [the defendant's] justifiable arrest on probable

---

[4] *See California v. Carney*, 471 U.S. 386, 391-92 (1985).

[5] *See Wyoming v. Houghton*, 526 U.S. 295, 300 (1999); *Carroll v. United States*, 267 U.S. 132, 149, 153 (1925).

[6] *United States v. Ross*, 456 U.S. 798, 807-08, 825 (1982).

[7] *Illinois v. Caballes*, 543 U.S. 405, 409 (2005) (*quoting United States v. Place*, 462 U.S. 696, 707 (1983)).

[8] *Place*, 462 U.S. at 707.

[9] *Id.*

cause."[10] Yet whether an indication by a dog trained and certified to detect drugs creates "probable cause to believe that the vehicle contains contraband" has not been answered by the Court.[11] The issue though is currently before the Court.[12]

Most courts, including the Eighth Circuit Court of Appeals, have concluded that probable cause arises when a trained drug-detection dog indicates to the presence of a controlled substance.[13] State courts have likewise followed suit.[14] This approach appears

---

[10]*Florida v. Royer*, 460 U.S. 491, 506 (1983).

[11]*Ross*, 456 U.S. at 807-08.

[12]*See Florida v. Harris*, 71 So.3d 756 (Fla. 2011), *cert. granted*, 132 S.Ct. 1796 (March 26, 2012).

[13]*United States v. Olivera-Mendez*, 484 F.3d 505, 512 (8th Cir. 2007); *United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999); *see also United States v. Winters*, 600 F.3d 963, 967 (8th Cir.) ("A drug-detection dog is considered reliable when it has been trained and certified to detect drugs"), *cert. denied*, 131 S.Ct. 255 (2010); *United States v. Grupee*, 682 F.3d 143, 147 (1st. Cir. 2012) (Souter, J.) (holding that an affidavit reciting only that a state police drug-detection dog indicated to the exterior of a vehicle provided the "magistrate with substantial basis to find probable cause for the car search" even though there was no statement "about the state police's standards for training drug-sniffing dogs or about the particular dog's success and error rate"), *cert. denied*, 133 S.Ct. 581 (2012); *United States v. Sanchez-Pena*, 336 F.3d 431, 444 (5th Cir. 2003) (stating that "evidence [ ] the dog was certified was sufficient proof of his training to make an effective alert" to establish probable cause and that courts should not, even when the dog's reliability is challenged, "take up whether the dog's training was sufficient"); *United States v. Kennedy*, 131 F.3d 1371, 1377 (10th Cir. 1997) ("We decline to encumber the affidavit process by requiring affiants to include a complete history of a drug dog's reliability beyond the statement that the dog has been trained and certified to detect drugs."), *cert. denied*, 525 U.S. 863 (1998); *United States v. Diaz*, 25 F.3d 392, 396 (6th Cir. 1994) (concluding "that testimony is sufficient to establish a dog's reliability in order to support a valid sniff," and that reliability need not be proven "with training and performance records"); *United States v. Robinson*, 707 F.2d 811, 815 (4th Cir. 1983) ("the detection of narcotics by a trained drug dog is generally sufficient to establish probable cause."); *United States v. Sentovich*, 677 F.2d 834, 838, n. 8 (11th Cir. 1982) ("[O]ther

(continued...)

to be the most consistent with recognition that whether there exists "'probable cause' to believe that contraband or evidence is located in a particular place" is a "commonsense question,"[15] which considers the "totality-of-the-circumstances" and, "'as the very name implies, ... deal[s] with probabilities.'"[16] "[P]robable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules."[17] The appropriate inquiry, therefore, is whether the

---

[13](...continued)
circuits have held that training of a dog alone is sufficient proof of reliability. We endorse the views of those circuits.").

[14]*People v. Stillwell*, 197 Cal. App.4th 996, 1005, 129 Cal. Rptr.3d 233, 239 (2011) ("California cases *** have not required evidence of a dog's success rate to establish probable cause."); *Oregon v. Foster*, 350 Or. 161, 170, n. 4, 252 P.3d 292, 298, n. 4 (2011) (observing that the cases recognizing that a well-trained dog's indication may establish probable cause "are too numerous for citation"); *Perkins v. State*, 300 Ga. App. 464, 468, 685 S.E.2d 300, 304 (2009) ("[W]e have rejected the argument that records of a drug dog's reliability are required to establish probable cause based on a dog's alert."); *Jones v. Commonwealth*, 277 Va. 171, 181 & n.3, 670 S.E.2d 727, 733 (2009) ("[T]he trial court properly held that the police department's failure to conduct back checks did not negate the dog's reliability"; such checks "are not necessarily a helpful way of determining whether a narcotics detection dog is reliable because the dog's indication is to the *odor* or narcotics, not the presence of narcotics."); *State v. Nguyen*, 157 Ohio App.3d 482, 500-02, 811 N.E.2d 1180, 1194-95 (2004) (because "proof of the fact that a drug dog is properly trained and certified is the only evidence material to a determination that a particular dog is reliable," the trial court erred by "ordering the state to produce [the dog's] real world reports"); *Maryland v. Wallace*, 372 Md. 137, 146, 812 A.2d 291, 297 (2002) ("[T]he law is settled that when a properly trained canine alerts to a vehicle indicating the likelihood of contraband, sufficient probable cause exists for a 'Carroll' search of the vehicle."), *cert. denied*, 540 U.S. 1140 (2004).

[15]*United States v. Gates*, 462 U.S. 213, 230 (1983).

[16]*Id.* at 231 (*quoting Brinegar v. United States*, 338 U.S. 160, 175 (1949)).

[17]*Gates*, 462 U.S. at 232.

trained and certified drug-detection dog's indication, when viewed objectively, allows the officer/handler to reasonably believe that "contraband or evidence of a crime will be found in [the vehicle in question]."[18]

A trained and certified drug-detection dog's indication, by itself, provides an officer with probable cause. Dogs, unlike humans, do not prevaricate.[19] A dog who is properly trained has a sense of smell exponentially more powerful and discriminating, than humans.[20] Proof that a dog has been trained and certified to detect drugs, like proof that

---

[18]*Id.* at 238-39; *see also Ross*, 456 U.S. at 808 (holding that an officer's "probable-cause determination must be based on objective facts that could justify the issuance of a warrant by a magistrate").

[19]*See United States v. Meyer*, 536 F.2d 963, 966 (1st Cir. 1976) (noting that "a canine, when trained, reacts mechanically to certain cues in his environment," and that [t]he same concerns that would be present in a human informant are simply not relevant here").

[20]William S. Helton, *Overview of Scent Detection Work: Issues and Opportunities, in Canine Ergonomics: The Science of Working Dogs*, 83, 93 (William S. Helton ed., 2009) ("[D]etector dogs deserve their reputation as the gold standard of detection technology."); Alexandra Horowitz, *Inside a Dog: What Dogs See, Smell, and Know* 71 (2009) (Dogs' noses are anatomically crafted to detect scents at extraordinarily low concentrations. Within the nasal cavity, dogs possess hundreds of millions of sensory receptor cells, dwarfing the six million in a human nose. After scents are trapped and detected, the receptor cells transmit signals to the olfactory "bulb," the part of the dog's brain devoted to smell that occupies a staggering twenty percent of the dog's total brain mass); Stanley Coren, *How Dogs Think* 51 (2004) (Scientists estimate the olfactory prowess of canines to exceed humans by a factor of one to ten *thousand*. The proportion of a dog's brain dedicated to olfaction is some forty times that of the human brain); Norma Lorenzo, et al., *Laboratory and Field Experiments Used to Identify Canis Lupus Var. Familiaris Active Odor Signature Chemicals from Drugs, Explosives, and Humans*, 376 Analytical & Bioanalytical Chemistry, 1212, 1212 (2003) ("even with technological advances and instruments, detector dogs still represent one of the most reliable real time detectors of contraband."); Sandy Bryson, *Police Dog Tactics*, 243, 256 (2d ed. 2000) (each drug has a "signature scent", a particular combination of molecules that a dog is

(continued...)

a radar gun has just been calibrated, provides sufficient evidence of reliability to justify investigatory action. For once the dog has indicated to an area, the handling officer necessarily possesses a "'substantial basis'" for concluding that there is a "fair probability that contraband or evidence of a crime will be found."[21]

If courts are to credit, as they routinely do, the trained senses of a police officer[22], they should be even more willing to credit the senses of trained and certified drug detection dogs who have no corrupt interest.[23] Indeed, in this country – and all over the world – trained detection dogs have been entrusted with missions of the utmost sensitivity

---

[20](...continued)
trained to recognize and "[d]epending on the density and rate of diffusion, the dog" unlike a human, "can detect drugs despite masking scents, intervening structures, vehicle bodies, or multiple layers of packaging."); Christopher S. Wren, *Harnessing the Powerful Secrets of a Dog's Nose*, N.Y. Times, August 3, 1999, http://www.nytimes.com/1999/08/17/science/harnessing-the-powerful-secrets-of-a-dog-s-nose.html?src=pm (noting that a trained dog's drug-detection accuracy rates far outstrip those of electronic drug detectors); L. Paul Waggoner, et al., *Canine Olfactory Sensitivity to Cocaine Hydrochloride and Methobenzote in Chemistry- and Biology-Based Technologies for Contraband Detection*, 2937 Proc. SPIE, 216, 216 (Pierre Pelon & Steve Brumeister eds., 1997) ("the dog's olfactory detection capabilities rival or surpass that of analytical instruments, and the dog-handler detection team remains the most effective technology available to law enforcement for the detection of narcotics.")

[21]*Gates*, 462 U.S. at 238-39 (*quoting Jones v. United States*, 362 U.S. 257, 271 (1960)).

[22]*See United States v. Johns*, 469 U.S. 478, 482 (1985) ("After the officers came closer and detected the distinct odor of marijuana, they had probable cause to believe that the vehicles contained contraband."); *United States v. Ventresca*, 380 U.S. 102, 111 (1965) ("A qualified officer's detection of the smell of mash often been held a very strong factor in determining that probable cause exists.").

[23]*See United States v. Ludwig*, 10 F.3d 1523, 1527 (10th Cir. 1993) (holding that a "dog alert usually is at least as reliable as many other sources of probable cause and is certainly reliable enough to create a 'fair probability' that there is contraband").

and importance, including detecting explosives, accelerants, survivors, gas leaks, toxins, and a wide range of species.[24]

It must be remembered that certainty is not required for probable cause. The possibility that drug odor may be present for some reasons unconnected to a car or occupant's wrongdoing does not enervate probable cause. An officer, for example, who sees white powder in a vehicle does not know without testing the powder that it is cocaine instead of baking soda, but probable cause exists if he sees the powder next to small vials and balloons.[25] "In making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty' but the degree of suspicion that attaches to particular types of noncriminal acts."[26]

**Performance in Controlled Versus Real World Settings**

A controlled environment provides the most effective means of determining whether a dog has undergone the training necessary to reliably indicate to drug odor. Those involved in evaluation exercises know where contraband is hidden. By correlating a dog's indications and non-indications to known locations, the dog's reliability in detecting drug odors can be verifiably gauged.

In the real world arena, the situation is markedly different, and it is not possible to assess a dog's reliability in the same way. If a dog does not indicate to a car that in reality

---

[24]*See* Helton at 83.

[25]*See Texas v. Brown*, 460 U.S. 730, 734 (1983).

[26]*Gates*, 462 U.S. at 244, n. 13.

contains drugs, the failure may never be discovered because the car was never searched. On the other hand, if a dog indicates to a vehicle in which contraband is not ultimately found, it is impossible to know whether the dog detected to a residual odor of a drug, a correct indication, but not one that resulted in the recovery of drug evidence or whether the dog indicated without there being any drugs at all.

A real world indication can fail to lead to the recovery of drugs for a number of reasons. The drugs could be so well hidden, that despite the searching officer's best attempts, nothing is found. Drugs could have recently been in the car, but removed, shortly before the dog's deployment and indication. Occupants or items in the vehicle might have been in close proximity to drugs prior to an indication. Or the dog might have indicated in the absence of any drug odor.

Only the last scenario amounts to a false positive; each of the others is an accurate indication. Yet when a dog indicates in the field, but no drugs are found, it is typically not possible to definitively ascertain which of these explanations applies.[27] An indication that does not lead to drug evidence, therefore, is not a "false" indication, but rather, merely an "unconfirmed" one.[28]

For these reasons, "unconfirmed" real world indications do not necessarily detract from a drug dog's reliability. For instance, field records may indicate that 55 percent of a particular dog's indications were confirmed in some manner by the recovery of drugs or

---

[27]See *Foster*, 350 Or. at 167, 177, 252 P.3d at 296, 301.

[28]See *United States v. Ludwig*, 641 F.3d 1243, 1252 n. 5 (10th Cir.), *cert. denied*, 132 S.Ct. 306 (2011).

by a car occupant's admission that drugs had been in the vehicle. But what about the remaining 45 percent of the indications? Were they accurate too? Most, if not all, of them may have been and their existence does not necessarily undermine the dog's reliability. By contrast, if the dog has a very low success rate in a controlled training or certification setting, in which all other explanations for a non-seizure indication can be eliminated, then the dog's lack of reliability can be more precisely determined.[29]

**Application**

Zara was first certified as a drug detection dog in July, 2011, and then recertified three months later. She and Biehl successfully completed numerous hours of narcotics-detection training and, up to the time of deployment in this case, had worked together for more than 10 months.

Zara also continued to be tested in monthly training exercises with Biehl. To maintain and develop Zara's talents, Biehl would engage Zara in mock traffic stops and building searches checking on the dog's ability to detect drugs. On average, Biehl

---

[29] See *South Dakota v. Nguyen*, 2007 S.D. 4, ¶21, 726 N.W.2d 871, 878 ("With the training being conducted on controlled circumstances, a dog's ability to find and signal the presence of drugs can be accurately measured. In the field, one simply cannot know whether the dog picked up the odor of an old drug scent or whether it mistakenly indicated where there was not drug scent."); see also Kenneth G. Furton, et. al., *Scientific Working Group on Dog and Orthogonal Detector Guidelines* 51, Research Report for the U.S. Dep't of Justice (Sept. 2010) ("In a certification proceeding you will know whether you have a false positive. You cannot know whether you have a false positive in most operational situations.").

conducted these exercises at least 16 hours per month and usually well in excess of this amount. Zara's drug detection performance in training sessions has been perfect.

Her "real world" field records likewise yield a high level of precision. These records reflect that Zara was correct (i.e., drugs were found or their presence, at one time, could be substantiated) 84.6 percent of the time when she indicated to a drug odor. Her stellar deployment marks bolster, to an even greater extent, her trustworthiness.

The question to be asked is whether Biehl, Schmiedt and Petit were justified, under the circumstances, in believing that there was a "fair probability" that Salgado's car contained drugs at the time Zara indicated.[30] Because Zara was a well-trained dog and had an exemplary track record, a fair probability – at the very least – existed at the time of her indication.

Once Zara indicated to Salgado's car, Biehl and his fellow officers had probable cause to search it for illegal drugs or evidence of a crime. Based on the totality of the circumstances, Zara's certifications and extensive training over 10 months of scrutiny, coupled with her outstanding success in the field, made her and her indications sufficiently reliable to establish probable cause for a warrantless search of Salgado's car for drugs and related evidence.

---

[30]*See Gates*, 462 U.S. at 238.

## CONCLUSION

Probable cause existed to search Salgado's Taurus. Zara's indication was sufficient to give Biehl, and his assisting colleagues, probable cause to believe that there was a controlled substance in the car. The dog's detection training and certifications, as well as her accuracy in real world deployments, made her trustworthy and a reliable source of information. No basis exists to exclude the evidence, including the methamphetamine, pipe and cap, that was seized from the car.

## RECOMMENDATION

Accordingly, it is hereby

RECOMMENDED that Salgado's motion[31] be denied insofar as it seeks to suppress the search of his car and the seizure of evidence from it based on Zara's sniff, alert and indication.

## NOTICE

An aggrieved party has 14 days after service to file written objections to this Report and Recommendation.[32]

---

[31] *See* Dkt. No. 71.

[32] *See* 28 U.S.C. §636(b)(1).

13

Dated this 17th day of January, 2013, at Pierre, South Dakota.

BY THE COURT:

_____
MARK A. MORENO
UNITED STATES MAGISTRATE JUDGE