UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | CR 12-30088-01-02-RAL |
| | * | |
| Plaintiff, | * | |
| | * | OPINION AND ORDER |
| vs. | * | REGARDING MOTION TO |
| | * | SUPPRESS AND ADOPTING |
| ALEXIS SALGADO | * | REPORT AND |
| and JAMES MENARD, | * | RECOMMENDATION |
| | * | |
| Defendants. | * | |

Defendants Alexis Salgado, James Menard, and David Andrews were charged in an indictment with possession with intent to distribute a controlled substance and aiding and abetting in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Doc. 1. Salgado filed a motion to suppress evidence and statements and sought drug-detection dog certification and performance records. Doc. 71. Menard and Andrews filed motions to join Salgado's suppression motion. Doc. 69; Doc. 70.

Magistrate Judge Mark A. Moreno held a hearing on the motion to suppress on December 28, 2012. T.[1] 1. Judge Moreno heard testimony from South Dakota Highway Patrolman Brian Biehl and South Dakota Highway Patrolman Justin Schmiedt. T. 13, 101. Judge Moreno received five exhibits into evidence. T. 2. On January 17, 2013, Judge Moreno issued a Report and Recommendation that Defendants' suppression motion be granted in part and denied in part. Doc. 87. Judge Moreno issued a separate Report and Recommendation on the issue of the canine search, recommending that Defendants' motion be denied on that issue. Doc. 88. The Reports and Recommendations were served upon the parties as required by 28 U.S.C. § 636, and Defendants

---

[1] Any references to the suppression hearing transcript will be "T" followed by the page number or numbers.

timely objected. Doc. 99; Doc. 101. Andrews thereafter pleaded guilty to a superseding information charging Possession of a Controlled Substance, in violation of 21 U.S.C. § 844(a). Doc. 107.

## I. FACTS

Justin Schmiedt is a trooper with the South Dakota Highway Patrol. T. 101. Trooper Schmiedt was on duty when he came upon a vehicle broken down on the side of the road approximately one or two miles outside of Winner, South Dakota, around 1:40 a.m. T. 103, 105, 143. Trooper Schmiedt pulled over and initiated a "motorist assist." T. 103. Two men, later identified as Salgado and Menard, approached Trooper Schmiedt and informed him that they needed no assistance, which Trooper Schmiedt considered an unusual response for a motorist assist. T. 105, 107. As he initially approached the stopped vehicle, Trooper Schmiedt shone his flashlight into the backseat of the vehicle and noticed a third male, later identified as Andrews, and electronics partially covered with a sweatshirt that had an embroidered marijuana leaf on it. T. 106-07. Trooper Schmiedt identified Salgado as the driver and asked for a driver's license. T. 107. Salgado was unable to provide one. T. 107. Salgado told Trooper Schmiedt, and a vehicle license plate search confirmed, that the vehicle was owned by Salgado's wife, Corinna Means. T. 196-97.

Trooper Schmiedt then took Salgado to the front seat of his vehicle and ran the name provided by Salgado, Ales Salgado. T. 111-12. The name Ales Salgado was not in the South Dakota system. T. 112. Trooper Schmiedt asked Salgado to provide the names of his passengers but Salgado said that he did not know their names and knew each of them as "Homie." T. 113. Trooper Schmiedt testified his suspicions were raised based on Salgado's general conduct and his evasive answers to questions. T. 114. Trooper Schmiedt then inquired of police dispatch about the availability of a drug dog. T. 113-14. Trooper Schmiedt asked several times for consent to search

2

Salgado's car. Salgado would not provide consent so Trooper Schmiedt called Trooper Brian Biehl for a drug-detection dog. T. 115-16.

Trooper Schmiedt did not search the vehicle, but continued to gather information from Defendants. Trooper Schmiedt contacted the United States Immigration and Customs Enforcement ("ICE") and discovered that Salgado was in the United States illegally, that ICE had tried to deport Salgado to his home country of Cuba, and that Cuba would not take him. T. 118. ICE reported that they did not want Salgado. T. 118. Trooper Schmiedt also discovered some past criminal activity by Salgado and the identities of Menard and Andrews. T. 118-21, 164. At some point, Trooper Schmiedt moved Salgado from the front seat to the backseat of his vehicle and had Menard come to the front seat. T. 120. Trooper Schmiedt also called Deputy Shawn Petit as backup. T. 124.

Trooper Biehl arrived on the scene at approximately 2:45 a.m. after driving from his home in Platte, which was approximately an hour after Trooper Schmiedt instituted the motorist assist. T. 37, 122, 165. Trooper Biehl is a police service dog handler for the South Dakota Highway Patrol. T. 13. Zara is Trooper Biehl's dog, and is the first dog that Trooper Biehl has handled. T. 14. Zara and Trooper Biehl have worked together since 2011, when they were trained for drug detection at a six-week course in Pierre, South Dakota, by the State of South Dakota. T. 14, 15. Zara was certified as a drug detection dog in July of 2011 and re-certified in October of 2011 and 2012. T. 17.

Zara alerted at the hood by the driver's side fender and indicated at the rear passenger door. T. 39, 90-93. Deputy Petit and Troopers Schmiedt and Biehl then searched the vehicle. T. 40. They recovered a pack of Newport cigarettes in plain view once the hood of the car had been opened. T. 40. The cigarette box contained methamphetamine. T. 41. There was a trace amount of marijuana

in a hat band in the rear passenger door as well as a glass pipe under the backseat. T. 41, 124. Trooper Schmiedt seized a Sony laptop from the backseat after all three defendants denied owning or possessing it. T. 125. There is no evidence that the laptop was stolen property. T. 125. Trooper Biehl left once the search was completed. T. 42.

Trooper Schmiedt arrested all three Defendants. T. 126. Trooper Schmiedt transported Salgado and Andrews and Deputy Petit transported Menard to the Winner jail. T. 126. At the Winner jail, Trooper Schmiedt advised each defendant of his Miranda rights. T. 126; Miranda v. Arizona, 384 U.S. 436 (1966). All three Defendants refused to waive their Miranda rights. There were no Miranda rights read to Defendants during the time that they were at the scene.

## II. MOTION TO JOIN

Menard has moved to join his co-defendant Salgado's motion to suppress evidence and statements and Salgado's motion for drug dog certification and performance records. Doc. 70. This motion is granted in part and denied in part. Menard is able to join Salgado's motion to suppress evidence and statements as to the seizure of Defendants. "Even though [Menard] lacked a possessory or property interest in the motor vehicle that would enable him to directly challenge the search, he may still contest the lawfulness of his own detention and seek to suppress evidence as the fruit of his illegal detention." United States v. Green, 275 F.3d 694, 699 (8th Cir. 2001) ("A passenger has standing to challenge his detention because all occupants of a stopped vehicle are subject to a Fourth Amendment seizure."). Therefore, to the extent that Menard joins Salgado in arguing that his detention was illegal, he has standing to do such and the motion is granted.

Menard does not have standing to challenge the search of the vehicle. In order to have standing to contest the search of the car, Menard must "demonstrate that he personally has a

reasonable expectation of privacy in the [car] because Fourth Amendment rights may not be asserted vicariously." United States v. Crippen, 627 F.3d 1056, 1063 (8th Cir. 2010) (citing United States v. Barragan, 379 F.3d 524, 529 (8th Cir. 2004)). Menard, in moving to suppress this evidence, "bears the burden of proving he had a legitimate expectation of privacy that was violated by the challenged search." United States v. Muhammad, 58 F.3d 353, 355 (8th Cir. 1995) (citing United States v. Kiser, 948 F.2d 418, 423 (8th Cir. 1991)); see also United States v. Salter, 358 F.3d 1080, 1084 n.2 (8th Cir. 2004) ("A defendant moving to suppress has the burden of proving a reasonable expectation of privacy in the area searched"). "As a mere passenger in a vehicle with no legitimate expectation of privacy," Menard cannot challenge the search of the vehicle. Crippen, 627 F.3d at 1063. Menard has no ownership interest in the vehicle, Menard was not the driver of the vehicle, and the search of the vehicle was not an instance of fruit of some poisonous tree. Thus, Menard has no standing to contest the search of the vehicle. It makes no difference whether Menard is allowed to join Salgado's motion in this regard, as Menard lacks standing and thus is not entitled to have any evidence of the vehicle search suppressed. Menard's motion to join is denied with respect to the vehicle search.

### III. MOTION TO SUPPRESS

Salgado makes four specific objections to the Reports and Recommendation. Doc. 99. Menard seeks to join in all four objections, but may only join in the first and second as he does not have standing to contest the search of the vehicle. Doc. 101. Salgado's objections are that (1) it was error to find that Trooper Schmiedt could question Defendants at all after Trooper Schmiedt was told that Defendants did not want assistance; (2) holding Defendants for over an hour to wait for the drug dog to arrive was not reasonable without a reasonable suspicion that drugs might be present; (3)

drug-detection dog records should be provided to the defense; and (4) the Government failed to prove the reliability of the drug-detection dog. Doc. 99.

**A. Seizure and Questioning of Defendants**

The Defendants' arguments focus on Trooper Schmiedt not initially having sufficient evidence to detain Defendants, thus making the detention unconstitutional. Doc. 99 at 5-6. Judge Moreno recommended a finding that the detention itself was a motorist assist not in violation of the Fourth Amendment, but that there was interrogation of Defendants while in custody and those statements are to be excluded as substantive evidence based on a violation of Miranda, 384 U.S. 436.

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. A "cardinal principle" in Fourth Amendment search and seizure jurisprudence is that searches conducted outside the judicial process, i.e. without prior approval by a judge, are per se unreasonable, "subject only to a few specifically established and well-delineated exceptions." Mincey v. Arizona, 437 U.S. 385, 390 (1978) (internal quotation marks omitted). "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." Florida v. Bostick, 501 U.S. 429, 434 (1991) (quoting California v. Hodari D., 499 U.S. 621, 628 (1991)). Such an encounter does not trigger Fourth Amendment scrutiny unless it loses its consensual nature. Id. "[M]ere police questioning does not constitute a seizure." Id.

With traffic stops, an officer may retain the driver while he completes "a number of routine but somewhat time-consuming tasks related to the traffic violation, such as computerized checks of the vehicle's registration and the driver's license and criminal history." United States v. Munoz, 590

F.3d 916, 921 (8th Cir. 2010) (quoting United States v. Barragan, 379 F.3d 524, 528–29 (8th Cir. 2004)). "To continue to detain a vehicle's occupants after the initial stop is completed, the officer must have been aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." United States v. Shafer, 608 F.3d 1056, 1062 (8th Cir. 2010) (internal quotation marks omitted). "'Whether an officer has reasonable suspicion to expand the scope of a traffic stop is determined by looking at the totality of the circumstances, in light of the officer's experience.'" Id. (quoting United States v. Gill, 513 F.3d 836, 844 (8th Cir. 2008)); see also United States v. Bracamontes, 614 F.3d 813, 816 (8th Cir. 2010).

This case arose out of a motorist assist, rather than a traffic stop. When an officer stops to help a vehicle, the encounter is, at the beginning, consensual. See Bostick, 501 U.S. at 436-37. Trooper Schmiedt's initial interaction with Defendants was consensual. At some later point, the interaction became non-consensual. Salgado was almost immediately placed into the patrol vehicle, while Menard was free to walk around and smoke during the initial investigation. According to the testimony of Trooper Schmiedt, Defendants were not free to leave at the point when Salgado was unable to provide a driver's license. T. 186, 199. Thus, the interaction became non-consensual when Salgado failed to provide a driver's license and Trooper Schmiedt determined that Defendants were not free to leave.

The question then is whether Trooper Schmiedt had the necessary "reasonable suspicion" to justify further detention. Munoz, 590 F.3d at 921. This Court "must determine whether the facts *collectively* provide a basis for reasonable suspicion, rather than determine whether each fact separately establishes such a basis." United States v. Stachowiak, 521 F.3d 852, 856 (8th

7

Cir. 2008) (emphasis in original). "To be reasonable, suspicion must be based on 'specific and articulable facts' that are 'taken together with rational inferences from those facts'—that is, something more than an 'inchoate and unparticularized suspicion or hunch.'" United States v. Stewart, 631 F.3d 453, 457 (8th Cir. 2011) (quoting Terry v. Ohio, 392 US 1, 21, 29 (1968)) (internal quotation marks omitted). The behavior on which reasonable suspicion is based does not need to establish that the suspect is probably guilty, or even eliminate innocent interpretations. Id.

The process of determining reasonable suspicion "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." United States v. Arvizu, 534 U.S. 266, 270-71 (2002). Trooper Schmiedt provided various justifications for his reasonable, articulable suspicion. Judge Moreno found Trooper Schmiedt's testimony reliable. "The magistrate's finding that the officer's testimony was believable is deserving of deference." United States v. Lockett, 393 F.3d 834, 837-38 (8th Cir. 2005).

At his initial contact with Defendants, Trooper Schmiedt became suspicious. To begin, it was obvious to Trooper Schmiedt that Defendants wanted him gone. T. 145. This was the first time that Trooper Schmiedt had initiated a motorist assist and the motorist was not open to assistance. T. 145. Trooper Schmiedt saw a piece of clothing, later identified as a hoodie, that was laying in the back of the vehicle and had a large embroidered marijuana leaf on it. T. 145. Under the hoodie was electronic equipment. T. 145. In addition to these initial observations, Trooper Schmiedt developed a reasonable suspicion once Salgado's name and date of birth did not come back matching anyone in the South Dakota system. T. 146. Trooper Schmiedt interpreted the lack of matching name to mean Salgado was likely trying to deceive law enforcement, was engaged in criminal activity, or had

warrants out for his arrest. T. 146. Although Trooper Schmiedt testified that there were other things, such as Salgado's inability to identify his passengers, that later created additional suspicion, these were the factors that led to the immediate reasonable suspicion that was sufficient to justify the detention of Salgado and Menard and extend the motorist assist. Shafer, 608 F.3d at 1062.

The Government has not objected to the Report and Recommendation, and therefore has not objected to the decision that statements made by Defendants during the detention are in violation of Miranda. The Fifth Amendment to the United States Constitution affords criminal suspects the right to be free from compulsory self-incrimination. Criminal suspects must have knowledge of their Fifth Amendment rights "before they can either intelligently exercise or waive these important privileges." United States v. Griffin, 922 F.2d 1343, 1356 (8th Cir. 1990); United States v. Running, 698 F. Supp. 2d 1186, 1191 (D.S.D. 2009). The United States Supreme Court held in Miranda that any time a person is taken into custody for questioning they must be advised of their Fifth Amendment rights in order "to counteract the 'inherently compelling pressures' of custodial interrogation." Arizona v. Roberson, 486 U.S. 675, 681 (1988) (quoting Miranda, 384 U.S. at 467). The safeguards of Miranda "assure that [a suspect's] *right to choose* between speech and silence remains unfettered throughout the interrogation process." Connecticut v. Barrett, 479 U.S. 523, 528 (1987) (quoting Miranda, 384 U.S. at 469) (emphasis in original). The suspect has the right to "control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." Michigan v. Mosley, 423 U.S. 96, 103-04 (1975).

Miranda "requires that a warning as to the availability of the privilege against self-incrimination and to the assistance of counsel be issued *prior to questioning* whenever a suspect is (1) interrogated (2) while in custody." Griffin, 922 F.2d at 1347 (emphasis in original); see also

9

United States v. Head, 407 F.3d 925, 928 (8th Cir. 2005) ("The requirements of Miranda are triggered only when a defendant is both in custody and being interrogated."). "The term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). Because Defendants were not given Miranda rights, they were in custody and not free to leave, and there was interrogation, this Court adopts the Recommendation that the statements fall within the purview of Miranda. T. 150. Accordingly, statements made by Salgado and Menard after 1:48 a.m. when Trooper Schmiedt first determined that Defendants were not free to leave are excluded as substantive evidence.

**B. Delay in Drug Dog Search**

Defendants contend that under the circumstances, Defendants were held for too long before Trooper Biehl and Zara arrived, particularly because Defendants contend that there was no reasonable suspicion of illegal drug activity. "A constitutionally permissible traffic stop can become unlawful . . . 'if it is prolonged beyond the time reasonably required to complete' its purpose." United States v. Peralez, 526 F.3d 1115, 1119 (8th Cir. 2008) (quoting Illinois v. Caballes, 543 U.S. 405 (2005)). "Whether a traffic stop 'is reasonable in length is a fact intensive question, and there is no *per se* time limit on all traffic stops.'" Id. (quoting United States v. Olivera–Mendez, 484 F.3d 505, 510 (8th Cir.2007)).

"[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500 (1983). The investigative methods employed are to be the "least intrusive means reasonably available to verify or dispel the

10

officer's suspicion in a short period of time." Id. The burden of showing that a seizure based on reasonable suspicion was sufficiently limited in scope and duration is on the state. Id. "[T]he reasonableness of a detention may be determined in part by 'whether the police are diligently pursuing a means of investigation which is likely to resolve the matter one way or another very soon . . . .'" Michigan v. Summers, 452 U.S. 692, 701 n.14 (1981) (quoting 3 Wayne R. LaFave, Search and Seizure § 9.2, p. 40 (1978)); see also United States v. Maltais, 403 F.3d 550, 557 (8th Cir. 2005) ("In assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation."). Trooper Schmiedt almost immediately inquired about the availability of a drug-detection dog unit, and as soon as it was clear to Trooper Schmiedt that he would not receive consent from Salgado to search the vehicle, he called Trooper Biehl to the scene. Trooper Schmiedt was "diligently pursuing a means of investigation" by calling a drug-detection dog unit to the scene based on his reasonable suspicion that there was illegal drug activity. Trooper Schmiedt identified the piece of clothing with an embroidered marijuana leaf as well as Salgado's responses to drug-related questions as reasons he has a suspicion of illegal activity. It was reasonable for Trooper Schmiedt to rely on these, and other factors, in determining that there was reason to hold Defendants until such time as a drug-detection dog unit could arrive.

Trooper Biehl drove from his home in Platte to the scene outside of Winner and arrived just an hour after Trooper Schmiedt first initiated the motorist assist. "[U]nder the proper circumstances, [the Eighth Circuit has] considered delays for dog-sniffs far in excess of 90 minutes reasonable." United States v. Donnelly, 475 F.3d 946, 953-54 (8th Cir. 2007); see also Maltais, 403 F.3d at 557-58 (finding three-hour delay to allow drug dog to reach remote location was reasonable because officers "acted with diligence and pursued the quickest and least intrusive means of investigation

11

reasonably available"); United States v. Riley, 684 F.3d 758, 761-62, 766 (8th Cir. 2012) (finding that a delay of just under an hour was reasonable). Under the circumstances here, Trooper Schmiedt was reasonable in pursuing a drug dog unit based on his reasonable suspicion of Defendants. The fact that the drug dog unit did not arrive for an hour does not make the detention of Salgado and Menard violative of the Fourth Amendment.

### C. Access to Drug-Detection Dog Records

Salgado argues that he should have access to drug dog records, including real world records, for the purpose of effective cross-examination to determine the reliability of Zara. Salgado also asks the Court to use a "totality of the circumstances" test to determine Zara's reliability. Doc. 99 at 8.

The Supreme Court has held that "the use of a well-trained narcotics-detection dog—one that 'does not expose noncontraband items that otherwise would remain hidden from public view'—during a lawful traffic stop, generally does not implicate legitimate privacy interests," and is not a search for purposes of the Fourth Amendment. Caballes, 543 U.S. at 409 (quoting United States v. Place, 462 U.S. 696, 707 (1983)). Courts look to the totality of the circumstances to determine whether there was probable cause to conduct a search. Maryland v. Pringle, 540 U.S. 366, 370-71 (2003); Brinegar v. United States, 338 U.S. 160, 176 (1949). Probable cause is a "fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983).

The Supreme Court recently considered how a court should determine if the alert of a drug-detection dog during a traffic stop provides probable cause to search the vehicle. See Florida v. Harris, 133 S.Ct. 1050, 1055-58 (2013). The Supreme Court found error with the Supreme Court of Florida's requiring "a strict evidentiary checklist, whose every item the State must tick off" to

12

assess the reliability of the drug dog and treating the dog's field performance record as the standard in determining reliability. Id. at 1056. In the real-world records of a drug-detection dog, "[e]rrors may abound." Id. The Court then stated the following:

> If a dog on patrol fails to alert to a car containing drugs, the mistake usually will go undetected because the officer will not initiate a search. Field data thus may not capture a dog's false negatives. Conversely (and more relevant here), if the dog alerts to a car in which the officer finds no narcotics, the dog may not have made a mistake at all. The dog may have detected substances that were too well hidden or present in quantities too small for the officer to locate. Or the dog may have smelled the residual odor of drugs previously in the vehicle or on the driver's person. Field data thus may markedly overstate a dog's real false positives. By contrast, those inaccuracies—in either direction—do not taint records of a dog's performance in standard training and certification settings. There, the designers of an assessment know where drugs are hidden and where they are not—and so where a dog should alert and where he should not. The better measure of a dog's reliability thus comes away from the field, in controlled testing environments.

Id. at 1056-57. For these reasons, the Supreme Court determined that "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust h[er] alert." Id. at 1057. Under the rule in Harris, this Court may assume, absent conflicting information, that Zara was reliable, and provided sufficient probable cause to search Salgado's vehicle, based on her successful completion of training in July 2011 and her recertifications in October 2011 and October 2012. See id.

However, a defendant still has the right to contest the reliability of a drug-detection dog. Id. The Supreme Court identified several ways in which defendants are allowed to contest a drug-detection dog search. These include cross-examination of the officer, introducing fact or expert witnesses, contesting the adequacy of the training program, questioning the dog's performance

13

during the relevant stop, and cross-examining the handler about the field history of the dog. Id. Notably absent is any requirement, or suggestion, that a defendant have access to the real-world records of a drug-detection dog.

In this case, Judge Moreno held an evidentiary hearing where the dog-handler, Trooper Biehl, testified and was cross-examined by the attorneys for all three Defendants. Judge Moreno also received into evidence certification documents from Trooper Biehl and Zara from October 2011, Ex. 4, and reviewed the deployment records of Zara *in camera*, Ex. 5. This Court has reviewed the transcript and each of these exhibits to determine whether Salgado was provided with proper procedural due process under the requirements of Harris and whether Zara is reliable. Under Harris, there is no requirement that Salgado be able to review the real-world records of Zara, and the Supreme Court has stated that the more reliable measure of determining the reliability of Zara is to examine her training records. Salgado argues that he "has no knowledge of what certification means in this case." Doc. 99 at 11. However, certification documents were received into evidence and Salgado's attorney cross-examined Trooper Biehl about the certification process. Ex. 4; T. 49-54. Salgado had a sufficient opportunity to challenge the reliability of Zara and explore the certification process.

Salgado also argues that a totality of the circumstances test must be used by this Court to determine the reliability of Zara, which necessarily includes defense access to and contestation of certification, training, and real world records. Doc. 99 at 11. Under the totality of the circumstances test set forth in Harris, 133 S.Ct. at 1056, defense counsel is not necessarily entitled to such records. Therefore, the totality of the circumstances test does not provide a basis to require that Salgado have access to additional records pertaining to Zara.

### D. Reliability of Zara

Salgado argues that the Government has failed to prove the reliability of Zara. Doc. 99 at 11. Salgado contends that without additional information about the certification process and without additional evidence about Zara's records, the Government has failed to prove the reliability of Zara.

Zara was first certified as a drug detection dog in July 2011, and then was re-certified in October 2011, and October 2012. Zara continues to receive training on a regular basis and had been working with Trooper Biehl for around ten months at the time she encountered the vehicle Salgado was driving. This Court has had the opportunity to review Zara's real-world records. Ex. 5. Those field records demonstrate a high level of precision. In fact, those records indicate that Zara was correct 84.6 percent of the time when she indicated to a drug odor; Trooper Biehl either found drugs or substantiated the prior presence of drugs in 84.6 percent of the occasions Zara alerted. T. 58-59. Salgado's attorney cross-examined Trooper Biehl about Zara's training and history. This Court "weigh[s] the competing evidence" to find that there was probable cause to trust Zara's alert and indication based on her training and history, and thus probable cause to search the vehicle. See Harris, 133 S.Ct. at 1058.

"[E]ven assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions." Id. at 1057-58. There is no evidence that there were any particular problems with Zara's alert and indication with regard to this vehicle. Zara alerted and indicated to two parts of the vehicle. Methamphetamine was found under the hood where Zara alerted and marijuana residue and a glass pipe were found in the backseat of the vehicle where Zara indicated. No special circumstances gave Trooper Biehl any reason to discount Zara's usual

15

dependability in this search. Thus, there was probable cause to search the vehicle.

## IV. CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that the Motion for Joinder by Menard, Doc. 70, is granted in part and denied in part. It is further

ORDERED that the Report and Recommendation, Doc. 87, and the Report and Recommendation, Doc. 88, are adopted by this Court. It is further

ORDERED that Salgado's Objections to the Report and Recommendation, Doc. 99, are overruled. It is further

ORDERED that Menard's Objections to the Report and Recommendation, Doc. 101, are overruled. Finally, it is hereby

ORDERED that the Motion to Suppress, Doc. 71, is denied except to the extent that certain statements in violation of <u>Miranda</u> are excluded as substantive evidence.

Dated April 1, 2013.

BY THE COURT:

_____
ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE